[No. 38535. En Banc. March 30, 1967.]

JAMES H. FITZGERALD et al., *Appellants*, v. ROBERT HOPKINS et al., *Respondents*.*

*Reported in 425 P.2d 920.

*Miracle, Treadwell & Pruzan,* for appellants.

*Paul W. Robben* and *Arthur G. Barnett,* for respondents.

WEAVER, J.—At the trial level this case presented a scintillating and intriguing dissertation on the art of sculpturing. It loses much of its glitter on appeal, however, for it presents, basically, a fact question.

Plaintiff, James H. Fitzgerald, 54 years of age, alleges in his complaint and amended complaint that "he has established himself over a period of years, as one of the foremost sculptors in the Northwest." The trial court found, and the evidence supports the finding, that plaintiff "is one of the leading sculptors of the Pacific Northwest." In its oral opinion the trial court stated that plaintiff "by reputation has achieved a position of stature in this community that probably is not matched by many other sculptors in the area." In truth, the record would support the conclusion that plaintiff's eminence in the field of art is even much broader.

In contrast, defendant, Robert Hopkins, 29 years of age, had his bachelor's degree in fine arts and was working and studying for his master's degree in sculpturing in the graduate school of the University of Washington.

Apparently, defendant was a promising student in his chosen field. Mr. George Tsutakawa, professor of sculpturing at the University of Washington and a well-known sculptor, recommended him to a firm of Seattle architects to execute a piece of sculpture for a building they had designed for a Seattle bank.

Defendant executed his commission. Named "Transcending," the work was 8 feet in height. Upon its installation at the bank, the present trouble arose.

In 1959 plaintiff had sculped a work of art that he named "Rock Totem." It was 13 feet high. We think the name rather significant. "Rock" needs no definition. "Totem" is of Algonquian origin. (Webster's New International Dictionary (2d ed.) ). We find no reference to a close relationship between a "totem" and the columns of the Egyptian and Greek temples, or to the abstract art of Picasso, Braque, Cezanne or Brancusi which is discussed so learnedly by the expert witnesses and the trial judge in his oral opinion.

We are impressed with the observation of the trial court:

> The use of the vertical form in sculpture, which is one of the issues here, is ancient, possibly dating as far back as 20,000 years ago as asserted by Mr. Fitzgerald [plaintiff], or possibly to 50,000 years ago as asserted by Professor Rader.

Neither plaintiff nor defendant invented vertical statuary, cubism, or abstract art. In fact, both have been exposed to approximately the same artistic influences, except that plaintiff, because of his age and practical knowledge, enjoys a much broader development in the field of sculpturing.

Plaintiff's first "Rock Totem" having been destroyed by fire, his final 13 foot sculpture was completed and exhibited at the Seattle World's Fair in 1962. Defendant saw it during the exhibition.

When plaintiff learned of defendant's "Transcending," he viewed it and then went to the office of the bank's architects. He reported that "Transcending" was a copy of his

"Rock Totem." Plaintiff was quite agitated. The person to whom he talked testified:

And he [plaintiff] accused Mr. Hopkins [defendant] of *thievery*, I guess—I think the word was—called him a *thief*, and he became quite hot-tempered within a very few minutes and used *profane language* and a few words I don't recall either. But I remember he became very hot-tempered in a very short time. I didn't expect it myself and I didn't know how to react to it. (Italics ours.)

Prior to the commencement of this action, plaintiff wrote a letter which ultimately came to the attention of counsel for the bank, the architects, and defendant. In it plaintiff wrote:

I know how many years it took me to arrive at this particular art statement and no law of probability would allow *an immature art student* to do it so quickly and in such a like image. *When a thief robs openly from a creative spirit no bit of talk around a legal table can quietly settle the issue. Is it not more important that the art student recognize his desire for money has guided his hand in his path of plagiarism.* . . . I ask this art student to remove his copy and replace it with a work of his own spirit. If this is not done immediately I ask for a suit in damages with the related publicity that will properly expose the time facts to the public. *I am sure no bank wants to be thought of as a thief and no architect wants a design that is not original.* (Italics ours.)

Plaintiff first sued the Seattle bank praying (a) that it be enjoined from using a copy of his statue, and (b) for $50,000 damages. The bank, in turn, joined defendant, Robert Hopkins, and the firm of architects as additional parties defendant. One architect was dismissed by agreement of the parties; the other architect and the bank were dismissed upon their motion for summary judgment.

In his amended complaint, plaintiff prays (a) for judgment of $50,000 against defendant Hopkins and (b) that defendant be enjoined from making "any further copies or imitations" of plaintiff's work. By trial amendment, plaintiff asserts a common-law copyright upon his sculpture "Rock Totem."

Defendant made a general denial and counterclaimed for $25,000 damages (made more specific by trial amendment) based upon alleged libel and slander.

■ The ultimate decision pivots upon the answer to one question: Is "Transcending" a copy of "Rock Totem"? The superior court is the only court authorized by the constitution to resolve this question of fact. *Gilbert v. Rogers*, 56 Wn.2d 185, 351 P.2d 535 (1960).

Characteristic of experts testifying in a field other than the exact sciences, there is a diversity of opinion.

After an extended trial and after viewing plaintiff's "Rock Totem" and defendant's "Transcending," the trial court dismissed plaintiff's complaint, based, primarily, upon finding of fact No. 4:

> That both pieces of sculpture were similar in that both had a vertical design with angular semihorizontal plane masses to a vertical axis. They were also similar in that they were both abstracts. The plaintiff's "Rock Totem" gave a feeling of rockiness with flowing lines in an upward movement. The texture of the surface material of the plaintiff's sculpture was dripped and brushed for a rough effect and contained little element of anatomy. The defendant's "Transcending" gave a different impression and could not be mistaken for a rock-like quality. This sculpture was squattier and had a semi-smooth surface with a definite feeling of anatomy. These dissimilarities and the testimony pertaining thereto were strong enough to convince the court as the trier of fact that *there had been no conscious copying done by the defendant.* (Italics ours.)

The thrust of plaintiff's appeal is that the trial court by the italicized portion of finding of fact No. 4, *supra,* placed upon plaintiff the burden of proving that defendant intentionally copied plaintiff's statue. We do not agree.

On appeal, the negative finding that "there had been no *conscious* copying done by defendant" is not completely satisfactory, but the trial court's oral decision, which we may consider in the circumstances (*Mertens v. Mertens,* 38 Wn.2d 55, 227 P.2d 724 (1951) ), makes it clear that the trial judge found that there had not been *any* copying for he said:

It is the opinion of the Court that the plaintiff has failed to sustain the burden of proving that there was any copying done by the defendant in this case.

There is evidence—although in sharp conflict—to support the trial court's finding that "Transcending" is not a copy of "Rock Totem"; hence, it was not error to dismiss plaintiff's action.

Plaintiff assigns error to the entry of judgment against him and his marital community for $15,000, which judgment is based upon finding of fact No. 5.

The plaintiff, James H. Fitzgerald, called at the offices of McClelland and Osterman, the architects who arranged for the commission of the defendant and *called the defendant*, who was then obtaining his Master's Degree in Art at the University of Washington, copyist, a plagiarist. Such statements coming from one of the foremost sculptors of the Pacific Northwest *did, without doubt, hold the defendant, Robert Hopkins, up to ridicule and derision in the art community and among the architects of the Northwest, and that the defendant, Robert Hopkins, had been substantially damaged.* (Italics ours.)

▇ We have heretofore set forth the alleged defamatory words spoken and written by plaintiff. In *Grein v. LaPoma,* 54 Wn.2d 844, 340 P.2d 766 (1959), we erased the distinction between the twin torts of libel and slander. The form of the statement is no longer important so long as a defamatory meaning is conveyed, published, or promulgated.

Plaintiff argues that a person who presents his work or product to the public for its approval and acceptance, thereby subjects it to public criticism, and honest comment upon it is privileged. Restatement, Torts § 609, p. 288. See *Cohen v. Cowles Publishing Co.,* 45 Wn.2d 262, 273 P.2d 893 (1954).

▇ We have no quarrel with the rule; but plaintiff's statements were not criticisms—constructive or otherwise—of the statue "Transcending." They refer to defendant as a person and as an artist. Such statements are imputations "affecting the . . . . [defendant] in his business,

trade, profession, office or calling" (Prosser, Torts § 107, p. 772 (3d ed.) ) and are actionable.

We are concerned, however, with the amount of damages allowed by the trial court. Without question, plaintiff impaired and injured defendant's reputation with those who had been a source of income to him in his chosen profession as a sculptor. When plaintiff wrote

> I am sure no bank wants to be thought of as a *thief* and no architect wants a design that *is not original* (Italics ours)

he was doing his best to blacken defendant's reputation as an artist and to make certain that defendant and his artistic work would be persona non grata in the future with those people whose approbation and approval could further defendant's economic well-being. In his appellate brief, plaintiff attempts to minimize the effect of this letter by claiming it to be privileged. The record discloses that the original of the letter was admitted in evidence with the statement of plaintiff's counsel that he had no objection.

Having carefully considered the record, however, we do not find the facts sufficiently persuasive to support the $15,000 valuation placed upon defendant's injury by the trial court. The amount shocks our sense of justice and sound judgment. See *Malstrom v. Kalland*, 62 Wn.2d 732, 738, 384 P.2d 613 (1963).

Finally, we find no merit in plaintiff's contention that the court erred when it entered judgment against plaintiff's wife. During trial, defendant's counsel moved to amend the pleadings to include plaintiff's wife and the marital community. Plaintiff's counsel stated that he had no objection to the amendment. Further, counsel approved the judgment entered "as to form." The precise question was presented in *Lake Air, Inc. v. Duffy*, 42 Wn.2d 478, 482, 256 P.2d 301 (1953), wherein the court said:

> While approval of a judgment as to form does not prevent an aggrieved party from appealing, it does preclude basing the appeal upon the wording of the judgment, since the trial court must be afforded an opportunity to

rule upon the question before it can be presented to us upon appeal.

In summary, we affirm the dismissal of plaintiff's action. It is our considered opinion that a reduction of the $15,000 judgment to $7,500 would be fair. If defendant does not accept judgment of $7,500 within 15 days after the remittitur has gone down from this court, a new trial shall be granted, limited to a determination of damages upon defendant's counterclaim.

Each party shall bear his own costs on appeal.

It is so ordered.

DONWORTH, ROSELLINI, HAMILTON, and HALE, JJ., concur.

HUNTER, J. (concurring in part and dissenting in part)—I concur with the majority except for its disposition of the issue of damages. I disagree with the majority's reduction of damages awarded the defendant from $15,000 to $7,500 or in the alternative granting the plaintiff a new trial. The sole reason given is that "the amount shocks our sense of justice and sound judgment."

The test to be applied for making such a determination is set forth in *Kramer v. Portland-Seattle Auto Freight,* 43 Wn.2d 386, 261 P.2d 692 (1953), cited in *Malstrom v. Kalland,* 62 Wn.2d 732, 384 P.2d 613 (1963):

> "On the other hand, the balancing factor is the conscience of the appellate court, when there is an affirmative showing that passion and prejudice played no part in the jury's determination. Is the amount flagrantly outrageous and extravagant? Is it unjustified in the light of the evidence? Does it disclose circumstances foreign to proper jury deliberations? If it is and does, then it can be said to shock the sense of justice and sound judgment, and the verdict of the jury is excessive."

Applying this test to the trial judge as the fact finder, I find nothing in the record to shock my "sense of justice and sound judgment." To be called a "thief" who "robs openly from a creative spirit . . . . in his path of plagiarism" by a man with the standing in the field of sculpturing as that of James H. Fitzgerald is devastating to a novitiate

932

attempting to establish a professional reputation as a sculptor.

In my opinion, the award of $15,000 for damages resulting to the defendant from these libelous and defamatory statements was within the range of the evidence. The judgment of the trial court should be affirmed without modification.

FINLEY, C. J., HILL, J., and LANGENBACH, J. Pro Tem., concur with HUNTER, J.

---

July 5, 1967. Petition for rehearing denied.