KENNETH GRIFFIN *et al., Appellants,* v. THE CASCADE
THEATRES CORPORATION, *Respondent.*[1]

[1]Reported in 117 P. (2d) 651.

*Granville Egan,* for appellants.

*Whittemore & Truscott,* for respondent.

DRIVER, J.—The plaintiffs, Kenneth Griffin and Vilma Griffin, husband and wife, instituted this action against the Evergreen State Amusement Corporation to recover for personal injuries which Mrs. Griffin sustained when she tripped upon an advertising sign in the lobby of a motion picture theater. By order of court, the Cascade Theatres Corporation was substituted as party defendant. A jury returned a verdict for the plaintiffs. The court granted defendant's motion for judgment notwithstanding the verdict, alternatively granted defendant's motion for a new trial, and entered a judgment dismissing the action. Plaintiffs appealed.

The respondent's Paramount Theater is situated at the corner of Pine street and Ninth avenue, in the city of Seattle. An open, outer lobby, with a small enclosed box office in the center, extends east and west across the front of the establishment. The entrance is to the right (west) of the box office, and the main exit is on the opposite side. The westerly half of the lobby is about sixteen feet wide and twenty-one feet deep from the property line to the back wall. The floor of the rear portion of this space is carpeted,

but, in front, for a distance of about eight feet back from the sidewalk, it is bare concrete.

At the time of the accident that is the basis of the present action, a rubber mat, approximately nine feet long and thirty-one inches wide, extended across this concrete space from the sidewalk toward the entrance door at the rear of the lobby. West of this mat, and about six feet back from the inner sidewalk line, an easel-type advertising sign was standing. It was of heavy cardboard and so constructed that, when placed upon the floor, it would stand upright upon its base. No one testified as to its exact dimensions, but photographs of it are in evidence, and we give the following as the nearest approximations which the record affords: It was about six feet wide and seven feet high, and the front, which faced the sidewalk, was covered with advertising matter and "still" photographs of actors and scenes taken from the pictures on the current program. Viewed from the front, it was somewhat wider near the top than it was two feet or so from the bottom, but it broadened out again at the base. Across its lower portion, the title of the main, current feature film "Gunga Din" was depicted in capital letters almost a foot high. The first two letters of the word "GUNGA" jutted out sharply on the left (easterly) side and sloped downward toward the left somewhat, the bottom of the "G" being only a few inches above the floor.

At seven o'clock in the evening of February 16, 1939, the appellants, Mr. and Mrs. Griffin, in company with the former's father and mother, drove to Seattle to see the opening day showing of the picture Gunga Din at the Paramount Theater, assembling at the corner of Ninth avenue and Pine street after parking their cars. Appellant Kenneth Griffin went directly to the box office to ·buy the tickets, but there were four or five

persons in line ahead of him, and the others walked in to the west, or entrance, half of the lobby. The elder Mr. Griffin proceeded around the west side of the advertising sign and stood behind it. The two ladies meanwhile waited a short time in front of the sign and then started toward the doorman, who was standing beside the entrance doorway at the rear of the lobby. As she passed the advertising sign, appellant Vilma Griffin stumbled over the projecting letter "G" and started to fall. She bumped into her father-in-law, however, and he caught her before she struck the floor. She had attended the Paramount Theater on prior occasions and had seen other advertising signs in the lobby. At the time of the accident, the lobby was brightly lighted.

There was no material conflict in the evidence regarding the circumstances thus far related. But the testimony was sharply in conflict as to whether appellant Vilma Griffin was on or off the rubber mat when she tripped, and also as to the relative positions of the sign and the mat. On these contested points, appellant Vilma Griffin testified:

"A. And I noticed him [Kenneth Griffin] getting close to the ticket office and I felt I should go and walk up toward my father-in-law. Q. He was standing back of the sign? A. Yes, he waited at the place up there. Q. Did you see him back there? A. Yes, I did. Q. Were there people going past him to the door? A. Yes. There were people milling around in there. Q. What were they doing there? A. Just waiting, I imagine. Q. These people, were they waiting for their escorts who were buying the tickets? A. Yes, sir. Q. Go ahead. A. And I followed up there— Q. Did you go upon this rubber mat there? A. This carpet, it seems to me it was a carpet. I am not positive. Q. What was it? A. Anyway something there, a carpet or a mat. To my recollection it was a carpet. . . . Q. And you were proceeding

along it? A. Yes, following other people. Q. You were following the people ahead of you? A. Yes. Q. Proceed. A. And I walked along following those people and suddenly my leg hit something and I stumbled over the object that hit me, it was one of those pieces that stuck out from the upper part of the sign and scraped my leg, and I caught ahold of my father-in-law who was standing just the other side of that sign and he stopped my fall. And I remember my hat was on and all hit and crushed and I looked down at my leg and mentioned that it was scraped and I was hurt by something. . . . Q. Now calling your attention to Plaintiffs' Exhibit '2' I will ask you if you could observe the entire sign—as you were walking up this carpet or rubber mat or whatever it was, were there any people ahead of you? A. Yes, there were. Q. Were you able to see the entire sign as you were walking up that carpet or rubber mat? A. No, I was not. I think I just saw that part of it when I was walking along (indicating). Q. You saw this part that had the pictures in it? A. Yes, sir. Q. And you knew the sign was there? A. Yes. Q. Were you able to see anything that protruded past the top part of the sign? A. No, I didn't see that. Q. Because there was somebody ahead of you? A. Yes, sir."

This appellant further testified that she immediately reported the accident to the theater manager and made out a written report on a form provided by him, in which she stated that her injury was "undetermined"; that thereafter she and her husband took seats in the theater and stayed for most of the main feature, but were obliged to leave because of her discomfort from "cramps or pains"; that the pains progressively increased in severity during the night, and the next morning she suffered a miscarriage, her pregnancy being slightly less than three months' duration.

Mrs. Griffin, Sr., testified that the accident happened as follows:

"A. . . . I was behind Vilma. When Kenneth got his tickets we moved on with three or four or five or six people that were ahead of Vilma and I followed her, and the first thing I knew she hit something and fell, or started to fall, and she didn't fall clear to the floor because my husband stepped out and caught her. . . . Q. Now, you say Vilma went ahead of you? A. Yes. Q. Where did you walk in relation to this rubber mat? A. I thought I was walking at the center of it. Q. That is where you were? A. Yes, at the center of the mat following Vilma. Q. You were following her? A. She was just ahead of me possibly two feet. Q. Was she on the rubber mat? A. Yes. Q. Where was this sign Gunga Din with relation to the rubber mat, where was it by distance, a foot away or two feet? A. No. Q. How close would you say to the— A. It seemed to me that it projected over the rubber mat. Q. Calling your attention to Plaintiffs' Exhibit '2,' what part of that projected, the letters? A. Yes, the letters right down here (indicating). Q. They projected over it? A. Yes, sir. Q. As you walked upon the rubber mat in back of Vilma were there other people ahead of her? A. Yes, there were."

Neither appellant husband nor his father saw Vilma Griffin stumble, but the former testified that he inspected the sign shortly thereafter and that it "protruded about an inch, it barely overhung the mat."

The theater doorman, a witness for the respondent, described his duties as follows:

"I take tickets, keep the outer lobby in shape and clean and see that there isn't anything wrong out there, so anything could happen to the patrons."

He further stated that he was standing beside the entrance door at the back of the lobby and "saw the lady fall"; that she was off the rubber mat, and there was no one in front of her at the time; and that the end, or edge, of the sign was about three feet distant from the mat.

The assistant manager, who was not present at the time of the accident, testified that, when he went off shift and left the theater at five o'clock in the afternoon of February 16th, the rubber mat in the lobby was in such a position that its west edge was about three or four feet from the sign.

█ A motion for judgment notwithstanding the verdict does not call for the exercise of any discretion on the part of the trial court. Such a motion should be denied unless it can be said as a matter of law that there is no substantial evidence, or reasonable inference from evidence, to support the verdict. And, in passing upon the motion, the court should view the evidence in the light most favorable to the party benefited by the verdict. *Holm v. Investment & Securities Co.*, 195 Wash. 52, 79 P. (2d) 708; *Beck v. Dye*, 200 Wash. 1, 92 P. (2d) 1113, 127 A. L. R. 1022; *Rice v. Garl*, 2 Wn. (2d) 403, 98 P. (2d) 301; *Lindberg v. Steele*, 5 Wn. (2d) 54, 104 P. (2d) 940; *Scholz v. Leuer*, 7 Wn. (2d) 76, 109 P. (2d) 294.

█ Very recently, in *Olsen v. Hamrick's Tacoma Theatres*, 9 Wn. (2d) 380, 115 P. (2d) 718, we had occasion to consider the duty of care which the operator of a motion picture theater owes to his patrons. In that case we said:

"It is a universally accepted rule that the proprietor of a place of public amusement, such as a theater, is required to exercise ordinary or reasonable care to put and maintain the premises, appliances, equipment, and devices which he devotes to such place of amusement in a reasonably safe condition for his patrons; and, if he fails to exercise such care, he may be held liable to the patron injured thereby. 62 C. J. 863, § 46; 26 R. C. L. 713, § 14; Notes (1923) 22 A. L. R. 610, 670; (1924) 29 A. L. R. 29, 33; (1935) 98 A. L. R. 557, 577. This court is in accord with that rule. *Hollenbaek v. Clemmer*, 66 Wash. 565, 119 Pac. 1114, 37 L. R. A. (N. S.) 698."

In the same opinion, we also pointed out that the amount of care required in any given case necessarily depends upon its particular circumstances, and that the term "ordinary or reasonable care" has been defined by this court as "that care which a reasonably prudent person would have exercised under the same or similar circumstances."

Applying the principles just stated to the instant case, we think there was ample evidence from which the jury could have found that the respondent was negligent in placing and maintaining the advertising sign and rubber mat as it did in its outer lobby. The laying of a runner mat in the lobby of a theater implies not only an invitation for the patrons to walk upon it, but even a suggestion that they do so, and further implies an assurance that it may be used with safety. The sign itself was unusual in its having a portion sharply protruding at the base, and it should not have been so placed that the protrusion substantially overhung the mat. A reasonably prudent person should have foreseen that a downtown Seattle theater exhibiting highly publicized feature pictures would at times attract large crowds; that, at such times, the patrons would be likely to walk along the rubber mat in rather close order; and that, under such circumstances, the projecting portion of the sign overhanging the mat would constitute a hidden hazard.

*Tyler v. Woolworth Co.*, 181 Wash. 125, 41 P. (2d) 1093, is factually somewhat similar, in a general way, to the case at bar. There, a customer, upon leaving a department store, fell down a step from a ramp to the sidewalk. She did not know the step was there, and she was unable to see it because the ramp was crowded with other customers entering the store. We held that the corporation conducting the store was chargeable with negligence. In the opinion, we said:

"The nature of the appellant's business and the character of its merchandise were such as to attract crowds to the store at certain times. . . . The respondent, as she attempted to leave the store through the south entrance, without any knowledge of the step, and edged her way through the crowd, had no opportunity of seeing or knowing that the step was there. There was no railing in the center of this ramp to separate the patrons entering the store from those leaving; neither was there any warning sign. Whether a step or stairway is obscured by lack of light *or by a crowd entering the store, which the appellant should have anticipated would occur,* the effect is the same." (Italics ours.)

The respondent cites a number of cases of this court involving storeroom accidents. They all differ materially from the present case as to their facts. Respondent particularly stresses one, which appears to be more nearly in point than any of the others, namely, *Engdal v. Owl Drug Co.,* 183 Wash. 100, 48 P. (2d) 232. In that case, a drugstore customer fell and was injured when she stepped backward and tripped over a platform weighing scale. We held that there was no substantial evidence of negligence on the part of the storekeeper to sustain a verdict in favor of the customer. It is apparent from the following quotation from the opinion, however, that the case is factually distinguishable:

"In this instance, the scale was placed behind a post somewhat over a foot square and, as would appear from the map and photographs, *out of line of travel. It, with the post and display table on the other side, formed the south boundary of the aisle* in which the respondent stood. Could the appellant, as a reasonably careful and prudent storekeeper, have foreseen that, placed in this position, the scale might cause accident to one of its customers? To answer this question in the affirmative would, we think, be subjecting the appellant to the observance of a standard not warranted by the law as deduced from our deci-

sions. With an aisle width of four and one-half feet, the owner could not reasonably forecast that some customer might sometime step backward and trip over the scale *standing out of the line of travel through the aisle.*" (Italics ours.)

The opinion also states that the scale "was of the type in common use in drug and other stores." If there had been an unusual projection extending out from this scale near the floor level, which projection had extended into, and encroached upon, the aisle or passageway, and if the customer had been unable to see it because of the proximity of other customers and had stumbled over it, then the cited case would be more nearly analogous to this one.

■ Nor do we think the trial court was warranted in finding that the appellant wife was guilty of contributory negligence as a matter of law. She testified that she had not paid any particular attention to the advertising sign until she started to walk past it, and that she did not see its projecting portion then because of the presence of other patrons immediately ahead of her. She was justified in assuming that she might safely walk upon the mat, and the obstruction of it, under the circumstances, was not so obvious as to challenge her attention. It was not incumbent upon her to watch her footing every step of the way. *Watson v. Zimmerman,* 175 Wash. 410, 27 P. (2d) 707; *Wiard v. Market Operating Corporation,* 178 Wash. 265, 34 P. (2d) 875; *Wood v. Washington Navigation Co.,* 1 Wn. (2d) 324, 95 P. (2d) 1019.

The fact that appellant Vilma Griffin walked along the rubber mat behind another patron who did not trip over the sign, does not conclusively establish her contributory negligence. A deviation of only an inch or so to the right of the other's pathway might have been sufficient to bring her foot in contact with the projecting letter "G." There was nothing to warn

her to walk in or near the center of the mat. It is our conclusion that the motion for judgment notwithstanding the verdict should have been denied.

Appellants also assign as error the granting by the trial court of respondent's alternative motion for a new trial. The court's order states the grounds upon which the motion was granted as follows:

"IT IS ORDERED that defendant's Motion for a New Trial in the above entitled action be, and the same is hereby granted, upon the ground that there is no evidence, or reasonable inference from the evidence, to justify the verdict of the Jury in favor of the plaintiffs, and that said verdict is contrary to law, *and upon the further ground that substantial justice was not done.*" (Italics ours.)

As we have pointed out, the testimony was directly in conflict on material factual issues. The question of granting or denying the motion for a new trial was largely within the discretion of the trial court. In *Billias v. Panageotou,* 193 Wash. 523, 76 P. (2d) 987, quoting from the opinion in *Corbaley v. Pierce County,* 192 Wash. 688, 74 P. (2d) 993, we said:

" 'The trial courts have wide discretion in granting or refusing new trials, and the exercising of this discretion in granting a new trial will not be interfered with except in situations in which purely questions of law are involved.' "

The rule thus stated was approved in *Henriod v. Henriod,* 198 Wash. 519, 89 P. (2d) 222; *Dibley v. Peters,* 200 Wash. 100, 93 P. (2d) 720; *Bystrom v. Purkey,* 2 Wn. (2d) 67, 97 P. (2d) 158.

Ordinarily, a much stronger showing of abuse of discretion is required to set aside an order granting a new trial than one denying a new trial. *McKay v. General Accident, Fire & Life Assur. Corp.,* 163 Wash. 92, 299 Pac. 987; *Ahrens v. Anderson,* 186 Wash. 182,

57 P. (2d) 410; *Mathisen v. Norton,* 187 Wash. 240, 60 P. (2d) 1; *Dibley v. Peters, supra.*

We are unable to say from the record that the granting of a new trial by the lower court involved "purely questions of law," and the record does not show that the court abused its discretion. The judgment dismissing the action notwithstanding the verdict is reversed, but the trial court's order granting respondent's motion for a new trial is affirmed.

ALL CONCUR.

[1] Reported in 117 P. (2d) 624.